```
CHRISTINA VON DER AHE RAYBURN (SBN 255467)
cvonderahe@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irvine, California  92614-8255
Telephone:     +1-949-567-6700
Facsimile:     +1-949-567-6710

JOHANNA LYNN JACOB (SBN 286796)
jjacob@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone:     +1-415 773 5420
Facsimile:     +1-415-773-5759

Attorneys for Plaintiff
X-TEAM INTERNATIONAL PTY. LTD.
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| X-TEAM INT'L PTY. LTD., a Australian Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ARGON INVESTMENT MANAGEMENT LLC, d/b/a ARGON GROUP, a Delaware limited liability company,<br><br>Defendant. | Case No. **'18CV0059 GPC JLB**<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff X-Team International Pty. Ltd. ("Plaintiff" or "X-Team") for its Complaint against Argon Investment Management LLC d/b/a Argon Group ("Defendant" or "Argon") hereby alleges as follows:

**THE PARTIES**

1.  Plaintiff X-Team is an Australian corporation that operates out of Australia and has its principle place of business in Australia.  X-Team has not incorporated in any state in the United States.  Since 2006, X-Team has provided trusted, motivated, and high-quality developers

1  to partner with companies in the development of their on-line tools, functionality, and website needs.

2.  Defendant Argon is a Delaware limited liability company with its principal place of business in Los Angeles, California. Plaintiff is informed and believes, and on that basis alleges, that Argon has one principal, Denis Livingston, who is domiciled in or around Dallas, Texas. On information and belief, Mr. Livingston is a citizen of Texas. Founded in 2016, Argon is an investment bank with a focus on digital finance, including cryptocurrency and token-based capital markets.

**JURISDICTION & VENUE**

3.  The Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and the dispute is between a citizen of Australia and a citizen of Texas. Plaintiff X-Team is a citizen of Australia. On information and belief, Defendant Argon is a citizen of Texas based on its principal, Denis Livingston, being domiciled in Texas. Accordingly, complete diversity exists. As alleged in greater detail below, Defendant Argon owes X-Team more than $200,000.

4.  Venue in this District is appropriate because this dispute arises out of a contract between the parties, signed on or around June 30, 2017, in which both parties consented to venue in this District as follows:

> This Agreement shall be governed by the laws of the State of California. Both parties agree that venue for resolution of any disputes arising from this Agreement shall be in San Diego, California.

**FACTUAL ALLEGATIONS**

*Argon Hires X-Team*

5.  Upon information and belief, Defendant Argon was founded in 2016 and is an investment bank with a focus on cryptocurrency and token-based capital markets.

6.  Cryptocurrencies are encrypted mediums for the decentralized exchange of monetary units, which are commonly called "tokens" or "coins." The best-known example of a cryptocurrency is Bitcoin, which was announced in 2009. Since 2009, cryptocurrencies have

1  gained popularity as a type of every-day investment opportunity. Tokens or coins for a new
2  cryptocurrency or token project are often distributed through an "Initial Coin Offering" ("ICO")
3  in order to raise money for the project. Cryptocurrency ventures are growing exponentially and,
4  with that growth, is a need for tools that allow the public to easily invest in those ventures.

5        7.      Sometime after its founding, Argon sought to build "TokenHub," an on-line
6  platform to allow for the issuance of ICOs. On information and belief, Argon hoped that
7  "TokenHub" would both: (1) comply with applicable laws and regulations; and (2) deliver a
8  simple end-to-end solution for crowd-funding investment in new cryptocurrency ventures. With
9  the complex new technology and strict financial regulations, Argon's project was ambitious.

10        8.      Upon information and belief, in order to build TokenHub, Argon originally hired a
11  third-party U.S. contractor, CloudSpace, to assist Argon with the development of the project.
12  Ultimately, however, Argon became dissatisfied with CloudSpace's work. Accordingly, Argon
13  turned to X-Team, a company that provides highly skilled web-tool developers to companies like
14  Argon, to take over the portions of the project that had been managed by CloudSpace.

15        9.      During contract negotiations in June 2017, Argon indicated to X-Team that X-
16  Team's role in assisting Argon with TokenHub would include: (1) improving the application's
17  performance to handle then-current traffic; (2) finding and fixing security vulnerabilities; and (3)
18  fixing bugs in the existing system. Argon further indicated that CloudSpace would assist in
19  making the transition from CloudSpace to X-Team easy and efficient, and that X-Team would
20  have full and immediate use of Argon's eleven-person development team in Russia ("Russia
21  Team"). Based on Argon's representations, including representations about the state of the
22  project, and without having received access to the existing code for the project, X-Team
23  originally estimated the total cost of the project to be $167,800 for a four-person staff
24  augmentation team, with work to be completed from July through September. Argon then asked
25  X-Team to focus on the additional functionality of allowing 50,000 purchases in 30 minutes,
26  which caused X-Team to increase its budget estimate. At all times during the negotiation, X-
27  Team stressed to Argon that X-Team's estimates were no more than estimates, and that the true
28  size of the team and project scope and cost would depend upon the state of code developed by

1   CloudSpace, which X-Team would evaluate once given access.

2         10.     At the end of June 2017, X-Team and Argon entered into the "X-Team Partnership Agreement: Argon Group," under which X-Team agreed to provide developers to work at the direction of Argon. That agreement is attached hereto as if set forth fully herein as **Exhibit A** (hereinafter, "Partnership Agreement").

      11.     In the Partnership Agreement, Argon hired X-Team to provide X-Team's development services at Argon's direction. Specifically, the contract required X-Team to provide, "[s]ubject to [Argon's] instruction and as may be required by [Argon]":

> [D]edicated development services including, but not limited to, front-end development, back-end development, API development, bug identification and fixing, advising and pointing out best practices that should be implemented, reviewing for performance and security concerns, suggesting reputable plugins to satisfy requirements and enhance site's security, providing technical feedback on solutions and any other technical assistance on items contained within the partner project.

*See* Exhibit A at §2 (General Description of Services). At all times, the X-Team developers were to work at Argon's direction. *Id.*, *see also* §5 ("X-Team shall provide qualified personnel (the "Personnel") to complete the Services and ensure that the Personnel perform their assignments ***under the direction of a Customer Point of Contact***. Personnel are allocated entirely to Customer, being forty (40) hours per week, and ***Customer is responsible for the provision of suitable and sufficient development tasks***") (emphasis added). Argon was contractually obligated to "determine the priority of tasks," and had "full authority to direct and provide feedback to X-Team regarding the Project." *Id.* In short, this was Argon's project; X-Team was simply providing expertise to help Argon realize its vision.

      12.     The initial "Term" of the Partnership Agreement ran from July 3, 2017 through September 29, 2017. *See* Exhibit A at §4. According to the Partnership Agreement, the "Term" was "understood to be an initial period for a longer engagement, which will be negotiated in good faith between Customer and X-Team at the conclusion of the Term." *Id.* After September 29,

1   2017, the Partnership Agreement "transfer[red] to open-ended and [could] be terminated at any
2   time by Argon Group by, and only by, a formal request to cease services." *Id.*  A formal request
3   to cease services "must be received Thirty (30) days in advance to the date in which Argon Group
4   chooses to terminate all or specific services provided." *Id.*

5   13.   The Partnership Agreement provided that X-Team would "provide qualified
6   personnel (the "Personnel") to complete the Services and ensure that the Personnel perform their
7   assignments under the direction of a Customer Point of Contact . . . ." *Id.* at §5.  The Partnership
8   Agreement further provided that X-Team would "make available a minimum of two (2) dedicated
9   full-time developers and one (1) full-time QA engineer." *Id.*  The Partnership Agreement set
10  forth the hourly and monthly rates for those and additional staff members, and made clear that X-
11  Team would be compensated for the work of its personnel on an hourly basis.  *Id.* at §6.

12  14.   The Partnership Agreement does not provide for any specific deliverable to be
13  delivered by any date certain.  Nor does the Partnership Agreement set forth a total or maximum
14  amount that Argon would pay to X-Team.  To the contrary, the Partnership Agreement is
15  structured as a time-and-materials contract, under which X-Team would be compensated, on an
16  hourly basis, for "dedicated development services," *id.* at §2, to be provided for at least three
17  months, but likely longer, *id.* at §4.

***X-Team Works Pursuant to the Terms of the Partnership Agreement, Despite Argon's Failure to Provide Necessary Requirements and Resources***

20  15.   Beginning almost as soon as the Partnership Agreement was signed, Argon failed
21  to provide to X-Team the guidance and resources that were: (1) required by the contract; and (2)
22  required to enable to allow X-Team's work to proceed efficiently.  For example, the Russian
23  Team that Argon assured X-Team would be available as an asset throughout development walked
24  off the project and withheld necessary information in August.  Argon also consistently provided
25  late and poor quality product requirements and refused—despite repeated requests—to
26  standardize the "work order" procedure or remedy conflicts in the business flow.  Argon also
27  changed its requirements with respect to several tasks in a belated fashion, and failed to manage
28  third parties effectively.  Despite these difficulties, X-Team worked knowledgably, effectively,

- 5 -    COMPLAINT FOR BREACH OF CONTRACT AND
BREACH OF IMPLIED COVENANT

1   and efficiently on the project, and was able to deliver a working system by October 2017.

2   16.   X-Team first received access to the code that CloudSpace developed in mid- to late-July 2017, well after the Partnership Agreement was signed.  When X-Team joined, and contrary to Argon's representations made during negotiations, Cloudspace did not work productively to onboard X-Team.  Further, just prior X-Team's hiring, Argon removed a member of the Russian Team from his role as CTO of Argon.  Argon did not hire another CTO until months later.  This resulted in a lack of technical leadership from Argon and a lack of incentive for either CloudSpace or the Russian Team to assist with X-team's onboarding.  Accordingly, nobody with historical knowledge of the project made any attempt to orient X-Team in the code or assist in X-Team's understanding of the code.  Complicating matters, CloudSpace's project development documentation was not satisfactory to assist X-Team in understanding the code structure or to successfully complete the project.  X-Team informed Argon that its documentation was deficient, and Argon instructed X-Team to rely on the Russian Team.  Argon told X-Team that the Russian Team would provide the necessary support, including by explaining the code that was written to-date and the overall business logic.  The Russian Team, however, did not do this.  X-Team did its best to dig into the code and begin work, despite these difficulties.

17.   By X-Team's second week on the project, in early July, X-Team came to believe that the other vendors—CloudSpace and the Russian Team—had not been given an adequate understanding of what the code was supposed to do and, as such, did not have an understanding of how the code actually worked.  X-Team conducted performance, security, and quality assurance tests, and found two critical security issues that needed to be addressed.  X-Team reached out to Argon for guidance, including requirements and business logic, but did not receive this guidance.  Argon provided to X-Team only a basic introduction to ICO, but did not show X-Team how the system worked (or should have worked), or how to properly verify users.  Argon pointed only to public documentation to explain these crucial elements of the system. When X-Team asked what third parties would need to be interfaced with and integrated to work with the TokenHub system and complete transactions, Argon informed X-Team that there were "none." Later, through X-Team's own research, X-Team learned that there were several third parties

crucial to the performance and functioning of TokenHub, including IdentityMind, NorthCapital, Node Bitcoin, and Mailchimp. X-Team continued working despite these difficulties.

18. Argon's complete failure to manage or assist in X-Team's development of TokenHub continued into the third week on the project. Argon was either unable or unwilling to provide the system requirements to X-Team, repeatedly referring X-Team to the Russian Team or stating that X-Team should be able to figure it out from the code already written. When X-Team turned to the Russian Team, however, the Russian Team refused to answer their questions. Ultimately, the Russian Team only deigned to answer X-Team's questions after Argon sent those questions on X-Team's behalf, and only then after a significant delay. Frustrating matters further, CloudSpace left the project just two weeks after X-Team began work on the project, and without providing X-Team with the project roadmap or key requirements. X-Team continued to work despite these difficulties.

19. By X-Team's fourth week on the project, X-Team finally achieved the level of familiarity with the project that they would have expected to have obtained—with Argon's help—during the first week. Because Argon had failed to provide X-Team with any assistance, X-Team spent significant and unnecessary time performing research, self-learning, and reverse-engineering on the state and structure of the source code. It was at this time—nearly a month into the engagement—that X-Team first learned the project had JIRA (a common software development project development tool that helps track, target, and prioritize bugs). Shockingly, no one previously thought to inform X-Team that JIRA was a tool it had access to on the project. During its fourth week on the project, X-Team continued to ask questions about Argon's desired functionality, only to have Argon respond that X-Team should "Google" it. This response was unhelpful; while basic knowledge about cryptocurrency is in the public domain, X-Team needed to know how *Argon* wanted its system implemented at a level that could be executed through source code. X-Team continued to move the project forward despite this fundamental lack of guidance.

20. During X-Team's fifth week on the project, and the last week of July, X-Team identified yet another serious security vulnerability in the system. When X-Team raised this with

1    Argon, Argon General Counsel, Emma Channing, responded that Argon knew that there were
2    significant security issues in the system, but that their prior developers were unable to resolve
3    them. X-Team undertook to solve this fundamental security issue as well.

4        21.    In August 2017, X-Team continued to struggle to get business requirements from
5    Argon. At the same time, the Russian Team walked off the project while continuing to refuse to
6    provide any assistance to efficiently transition work from the Russian Team to X-Team. Also
7    during this time period, Argon made clear, for the first time, that Argon expected X-Team to
8    configure a third-party software—Internet Download Manager ("IDM")—to work with
9    TokenHub. By the end of August, X-Team completed the configuration of IDM to make it work
10   with TokenHub. This additional project added time and complexity to the work X-Team had
11   originally accepted.

12       22.    In September 2017, Argon told X-Team (for the first time, and despite past
13   inquiries by X-Team on this topic) that TokenHub needed to work with NorthCaptial, another
14   third-party verification platform. Again, X-Team was able to accommodate Argon's request, but
15   doing so added time and complexity to the project.

16       23.    At the end of September and in early October, at Argon's urging and insistence, X-
17   Team pushed hard to get TokenHub ready to launch. Given the unexpectedly poor state of the
18   system and the lack of guidance from Argon, as detailed above, X-Team was forced to employ
19   significant resources, work seven days a week, and work long days in order to increase the quality
20   and safety of the system in a timeframe desired by Argon. Ultimately, and despite the serious
21   issues with Argon's leadership on the project, X-Team successfully assisted Argon with
22   launching a fully functioning TokenHub on October 9, 2017.

23                           ***Argon Group Praises X-Team's Work***

24       24.    Throughout the term of the Partnership Agreement, X-Team delivered work in full
25   compliance with all material terms of the contract. As just one example, in an October 6, 2017
26   email that Denis Livingston (Argon's Chief Financial Officer) wrote to Kasper Myram (X-Team),
27   Mr. Livingston thanked X-Team for a productive call, for their hard work, and stated that "it's
28   really great to see that we're making great progress toward the finish line." This praise came just

1  three days before the launch.

2  25.    Email and Slack correspondence from Bill Weir (Argon's Chief Technology
3  Officer) to X-Team was consistently in the same vein, even after the October 9, 2017 launch. Mr.
4  Weir even recognized that the launch was smoother than he could have anticipated. This
5  correspondence makes clear that the teams were working together productively to achieve a goal,
6  and dealing together with setbacks and challenges that are typical in software development.

### *Argon Group Fails to Pay X-Team*

8  26.    As it had done in previous months without issue, on September 18, 2017, X-Team
9  issued to Argon an invoice for X-Team's September 2017 work. Pursuant to §6 of the
10 Partnership Agreement, X-Team "is to be paid pursuant to the rate schedule," and "amounts will
11 be payable within twenty-one (21) days of Customer's receipt of an invoice delivered by X-
12 team."

13 27.    Unlike previous months, however, Argon did not pay the amount of that invoice
14 within 21 days. Nor—during that time period—did Argon provide any indication that it would
15 refuse to pay or any explanation thereof. To the contrary, well into October 2017, Argon
16 employees directed and encouraged X-Team employees to continue working—at an intensified
17 rate—on TokenHub. For example, on September 27, 2017, Mr. Weir sent an email to Mr. Foley
18 (X-Team) and others requesting "a focused effort to complete the remaining tasks, many of them
19 needed this week." As another example, on October 6, 2017, Mr. Livingston sent an email to Mr.
20 Myram summarizing a call and outlining next steps for X-Team.

21 28.    In late October, after receiving no payment on its September invoice, X-Team
22 requested an explanation for Argon's late payment. In response, on October 24, 2017, Argon
23 asserted that it should be entitled to a 70% discount on X-Team's September invoice and refused
24 to pay the full amount. Even today, Argon refuses to pay the amount of its September invoice.
25 Similarly, Argon has not paid X-Team for its work into October, even though Argon continued to
26 instruct X-Team to work well into October, and X-Team has invoiced Argon for its time.

27 29.    Argon's *post hoc* explanation for its refusal to pay the September and October
28 invoices is that X-Team failed to provide a fully functioning system by a late-September target

date that Argon claims to have identified during the June 2017 negotiations between the parties. This explanation fails. The Partnership Agreement only provides that Argon may withhold payment of invoices if X-Team is "otherwise in breach of this SOW." Exhibit A at §6. X-Team has not breached the Partnership Agreement in any way, and certainly did not do so by missing any September target date. As explained above, the Partnership Agreement does not provide for the delivery of any specific deliverable by any date certain. Instead, the Partnership Agreement is a time-and-materials contract for the delivery of "development services." There is no question that X-Team delivered those services throughout September and October 2017. Additionally, to the extent there was any delay in the delivery of a final product, that delay was the fault of Argon, not X-Team, as explained above. Further, if it *were* Argon's position that it could refuse to pay X-Team as of the end of September, that position would not justify Argon's refusal to pay *for work that X-Team completed in September*. Finally, if it were Argon's position that it could refuse to pay X-Team as of the end of September, Argon should have taken that position at the end of September, so that X-Team could have reacted appropriately at that time. Instead, Argon continued pressing X-Team to deliver more and more work product well into October, knowing full-well that Argon had no intention of paying X-Team for that work product.

30.     In September, X-Team personnel performed for Argon and invoiced $97,520-worth of work. In October, X-Team performed for Argon and invoiced $111,720-worth of work in standard hours. In October, X-Team also performed for Argon approximately $18,000 in overtime hours.

### *Argon Group Fails to Terminate the Contract with X-Team*

31.     The Partnership Agreement specifies that its "Term"—as well as required payments thereunder—lasted at least through September 29, 2017, and continued thereafter on an open-ended basis, to be terminated by Argon "by, and only by, a formal request to cease services." Such request needed to be received by X-Team from Argon "Thirty (30) days in advance to the date in which Argon Group chooses to terminate all or specific services provided." Exhibit A at §4. This is a necessary provision in any contract X-Team signs, because X-Team needs at least a month to re-assign its personnel to other projects. Allowing for immediate

COMPLAINT FOR BREACH OF CONTRACT AND
BREACH OF IMPLIED COVENANT

cancellation of a contract, without such notice, results in X-Team losing at least a month's income, because it is not able to instantly re-assign its developers.

32. Argon, however, did not provide this notice in September 2017 or October 2017. To the contrary, in October 2017, Argon continued to request that X-Team perform services under the Partnership Agreement. Indeed, the earliest possible "formal request" to cease services occurred on December 22, 2017, in an email communication from Argon's outside counsel to X-Team's outside counsel. For that reason, Argon owes to X-Team the amount that X-Team would have been able to earn had it continued to work for Argon through January 21, 2018.

### *Argon's Refusal to Pay Has Resulted in X-Team Losing Business*

33. Argon's refusal to pay X-Team for its work has resulted in X-Team losing business. Currently, cryptocurrency is an extremely hot field, with many start-ups looking to developers, like X-Team, to help them cash in on this new industry. Like any new industry, time is of the essence in becoming the "go to" company in that field. In pitching work to clients and potential customers in the cryptocurrency industry, X-Team has refrained from pointing to TokenHub, which Argon is currently using despite Argon's continuing failure to pay X-Team, as an example of its successful work. When X-Team is pitching new projects, potential clients want to see that X-Team has past demonstrated success in this complex industry. X-Team has refrained from including TokenHub in its pitches, portfolio of past projects, and marketing materials, specifically because of the ongoing dispute between X-Team and Argon. Upon information and belief, this has resulted in lost engagements.

### **FIRST CAUSE OF ACTION**

(Breach of Contract)

34. X-Team realleges and incorporates by reference paragraphs 1 through 33 of this Complaint as though fully set forth herein.

35. Argon entered into a written contract, the Partnership Agreement, with X-Team to pay for dedicated development services on an hourly basis.

36. X-Team performed dedicated development services for Argon in accordance with the terms of its Partnership Agreement.

37. X-Team has repeatedly demanded payment for all of the services rendered to Argon, and by the filing of this Complaint, X-Team hereby demands payment of the unpaid sums. Argon has failed and refused, and continues to fail and to refuse, to pay for all of the services X-Team has provided. Argon's continued refusal to pay is a violation of the Partnership Agreement.

38. X-Team is informed and believes and thereon alleges that Argon has continued to use X-Team's work product. Because Argon has not paid for all of X-Team's services, Argon's use of X-Team's work product violates the Partnership Agreement.

39. X-Team is informed and believes and thereon alleges that Argon failed to inform X-Team that it would cease use of X-Team's services even after Argon knew that it would no longer pay X-Team. Because Argon stopped paying for X-Team's services despite not having given formal 30-day notice to X-Team that it would do so, Argon violated the Partnership Agreement.

40. Accordingly, as a direct and proximate result of Argon's breaches of contract as alleged herein, X-Team has sustained damages in an amount to be proven at trial.

41. Pursuant to §14 of the Partnership Agreement, because Argon is in default on the invoices that it owes to X-Team, X-Team is entitled to "recover costs associated with the collection of these invoices," including attorneys' fees, costs, and other expenses.

**SECOND CAUSE OF ACTION**

(Breach of Implied Covenant of Good Faith and Fair Dealing)

42. X-Team realleges and incorporates by reference paragraphs 1 through 41 of this Complaint as though fully set forth herein.

43. Argon entered into a written contract, the Partnership Agreement, with X-Team to pay for dedicated development services on an hourly basis.

44. X-Team performed dedicated development services for Argon in accordance with the terms of its Partnership Agreement.

45. Under the Partnership Agreement, Argon had an implied obligation to only request work for which it planned to pay. Despite the fact that Argon knew that it did not plan to pay X-Team's September 2017 invoice, issued on September 18, 2017, Argon continued to request that

X-Team work well into October 2017.

46. X-Team repeatedly demanded that Argon pay its outstanding invoices. Argon has failed and refused, and continues to fail and to refuse, to pay for all of the services X-Team has provided.

47. Argon's refusal to pay X-Team is a breach of the implied covenant of good faith and fair dealing inherent in the Partnership Agreement. This is particularly true where, as here, Argon continued to request X-Team's work even after it was aware it would no longer pay for such work.

48. By continuing to request work from X-Team in order to induce X-Team to continue to perform that work, and then failing to pay for invoices issued before it made those requests and invoices issued to cover the work done in response to those requests, Argon acted in bad faith, abused its power and discretion under the Partnership Agreement, and violated X-Team's reasonable expectations under the Partnership Agreement to be paid for all work performed for Argon. By requesting such work and then refusing to pay for the work, Argon has not only violated its implied obligations under the Partnership Agreement, but has frustrated X-Team's reasonable expectations and purpose under the contract.

49. Accordingly, as a direct and proximate result of Argon's breaches of the implied covenant of good faith and fair dealing inherent in the Partnership Agreement, X-Team sustained damages in an amount to be proven at trial.

## DEMAND FOR RELIEF

WHEREFORE, X-Team prays for relief as follows:

A. Entry of judgment for X-Team on all causes of action;

B. An order of restitution against Argon in an amount equal to the reasonable value of the services X-Team provided, and for which X-Team has not been paid;

C. An order awarding X-Team damages it has sustained as a result of Argon's wrongdoing in an amount according to proof;

D. Prejudgment interest;

E. Attorneys' fees and costs pursuant to the Partnership Agreement; and

F.  Any and all other legal and equitable relief as may be available under law and which the Court may deem just and proper

## JURY DEMAND

X-Team demands a jury trial for all issues so triable.

Dated: January 8, 2018

CHRISTINA VON DER AHE RAYBURN
JOHANNA L. JACOB
Orrick, Herrington & Sutcliffe LLP

*/s/ Christina Von Der Ahe Rayburn*
Christina Von Der Ahe Rayburn
Attorneys for Plaintiff
X-Team